Usama S. ABDEL–WHAB, Plaintiff,

v.

ORTHOPEDIC ASSOCIATION OF DUTCHESS Dr. Sasha Ristic Physician Assistant, Unknown Saint Francis Hospital Saint Francis Hospital's Emergency Room Defendants.

Usama S. Abdel Wahab Plaintiff,

v.

Jason Capstraw, Defendant.

Usama S. Abdel Whab Plaintiff,

v.

Jason Capstraw, Saint Francis Hospital, D.E.A. Key, Karen Tice, Frank Hemmerick, Grittlow and Russell Hanley Defendants

Nos. 04 CV 7772(CM), 05 CV 2896(CM), 05 CV 4929(CM).

United States District Court, S.D. New York.

Jan. 18, 2006.

Usama Sadik Abdel Whab, Fishkill, NY, Pro se. [1].

Wendy H. Waszmer, Assistant United States Attorney, New York City, for Defendants.

## DECISION AND ORDER GRANTING DEFENDANT CAPSTRAW'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

MCMAHON, District Judge.

Plaintiff Usama S. Abdel Whab [2] brings these consolidated actions alleging both common law and constitutional tort claims.

---

**1.** Mr. Whab was recently deported as a result of his criminal conviction. Realizing that he would inevitably be deported during the pendency of this and his other civil actions, he previously asked Magistrate Judge Lisa Margaret Smith, that in the event of his deportation, to send all communications to the Fishkill address.

**2.** Although plaintiff was prosecuted under the name "Usama Sadik Ahmed Abdel Whab," and has filed all of his numerous civil cases using the surname Whab, he spells his name "Wahab" in docket 05CV2896.

Special Agent Capstraw of the Drug Enforcement Administration is a named defendant in consolidated dockets 05 CV 2896 and 05 CV 4929. The claims in the amended complaint arise from Agent Capstraw's interview of plaintiff in late 2001, during an FBI-led investigation into individuals with possible terrorist connections. Based on his statements to Agent Capstraw, plaintiff was subsequently convicted of making false statements to a federal officer. Plaintiff brings this action against Agent Capstraw alleging violations of the First, Fourth, Fifth, and Fourteenth Amendments, as well as a common law claim of emotional distress.

Agent Capstraw has filed motions asking the Court to dismiss the amended complaint for lack of subject matter jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6) of the Federal Rules of Civil Procedure, or in the alternative, for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## I *Plaintiff's Criminal Trial*

### A. *The Indictment*

In June 2002, Plaintiff was charged in a three count indictment filed in the Southern District of New York, with three separate charges: (1) making a false statement in an application for a United States passport, in violation of Title 18, United States Code, Sections 1542 and 2; (2) making and using a false writing, specifically, a forged baptismal certificate, in support of his application for a United States passport, in violation of Title 18, United States Code, Section 1001, and; (3) making a false statement to a federal agent, in violation of Title 18, United States Code, Section 1001.

Defendant plead not guilty and proceeded to trial on July 16, 2002.

### 1. *The Government's Case*

The evidence at trial overwhelmingly established that in June 2001, Whab, an Egyptian-born citizen of Egypt, falsely claimed in an application for a United States passport that he was born in "Broklin" (Brooklyn), New York. In support of his false application, Whab submitted birth affidavits, purporting to be from individuals with personal knowledge of his birth, which were false. Upon receiving a request for additional documentation supporting his fraudulent claim that he was born in the United States, Whab submitted a forged baptismal certificate, which he created by whiting out portions of his wife's baptismal certificate, to the United States Passport Agency (the "Passport Agency"), a division of the U.S. Department of State. In October 2001, when Whab was interviewed by a federal agent in connection with an official investigation, Whab again falsely stated that he had been born in Brooklyn and was an American citizen.

The evidence included Whab's passport application, the testimony of the Duchess County Clerk who accepted it, and the passport fraud prevention manager who sought and received additional documentation from Whab. Also introduced were numerous statements by Whab, made both before and after he applied for a United States passport in June 2001, in which he said that he was born, not in Brooklyn, but in Egypt in 1975. In addition, both of the individuals who had signed birth affidavits, purportedly attesting to their knowledge of Whab's birth in Brooklyn, which Whab submitted in support of his passport application testified at trial. Each of these individuals testified that the affidavits (which were also introduced) were false, that they had no knowledge of Whab's birthplace, and that they signed the affidavits at Whab's request. Finally, the Pas-

tor of the Immaculate Conception Church in the Bronx testified that the baptismal certificate from Immaculate Conception, which Whab had submitted to the Passport Agency, was a forgery.

a. *Whab's False Statement In His Passport Application That He Was Born In "Broklin" And His Submission of Phony Birth Affidavits*

On June 20, 2001, Whab submitted an application for a United States passport at the Dutchess County Clerk's office in Poughkeepsie, New York. (Tr. 36–46; GX 3). In the application, Whab stated that his name was "Usama S. Abdel Whab," that his residence was "P.O. Box 648, Fishkill, New York" and that he was born in "Broklin, New York" on May 27, 1975. (Tr. 37–38; GX 3). Whab also indicated on the passport application that his mother, "Kristena Istevan," was born in New York in 1961. (Tr. 39–40; GX 3). Whab signed the application under the certification, "I solemnly swear (or affirm) that the statements made on this application are true . . . ." (GX 3).

Upon observing Whab's statement in his passport application that he was born in "Broklin," the registry clerk (who herself was from Brooklyn) engaged Whab in general conversation about Brooklyn and several Brooklyn landmarks. (Tr. 37–38). During this conversation, Whab spoke with a "distinct arabic accent" and did not seem at all familiar with Brooklyn. (Tr. 37–38, 41.) Whab stated that he was born in Brooklyn but went back to Egypt when he was very young. (Tr. 50).

In addition, the registry clerk noted that Whab had failed to complete the social security number section of the passport application. She advised Whab that a social security number was required, and Whab responded that he "didn't know what [a social security number] was." The clerk told Whab that the Social Security office was near the Dutchess County Clerk's office, and instructed him to "get the information and come back." Whab left, and upon his return, stated that he did have a social security number but that it had been "suspended." (Tr. 38). Whab later admitted during his testimony that he did not have a social security number, but had lied previously about having one to get something that he needed, such as a job. (Tr. 228–29, 242).

As part of his passport application, Whab submitted a report from the New York City Department of Health indicating that a search had been performed, and that there was no official record of Whab's birth in New York City between 1974 and 1976. (Tr. 41; GX 4). Whab provided this certificate because an applicant for a United States passport must establish both his identity (that he is who he says he is) and his United States citizenship. (Tr. 59). If an individual is unable to prove his United States citizenship through typical means such as a birth certificate or certificate of naturalization, he is required to produce, among other things, proof that there is no official record of his birth. (Tr. 29; GX 4). An applicant lacking an official record of birth but claiming to have been born in the United States may also submit "birth affidavits" from individuals with personal knowledge of the applicant's birth, such as the doctor performing the birth or a relative who personally witnessed the birth. (Tr. 32; GX 5, GX 6). In accordance with this practice, Whab submitted with his passport application two such "birth affidavits." (Tr. 41; GX 5, GX 6).

In each of the two birth affidavits submitted by Whab, the affiants, Kevin Titus and Susan Brown, stated that Whab was born in Brooklyn or "Broklin," although neither claimed to have personally wit-

nessed Whab's birth. (GX 5, GX 6). Kevin Titus' affidavit stated that he had known Whab for "26 years," that Whab was born in "Reed Hook, Broklin, NY" on May 27, 1975, and that Titus knew Whab's mother, "Kristin," who passed away "15 years ago, by breast cancer," as well as Whab's grandmother, who had "also passed away." (GX 5). Susan Brown's affidavit stated that she had known Whab for "20 years," and had known Whab's mother, "Kristena Istevan," before meeting Whab. Brown also stated that Whab's mother passed away "15 years ago." (GX 6).

At trial, Titus and Brown both testified that the birth affidavits were entirely false. (Tr. 91–104). Whab told Brown exactly what to write in her birth affidavit (Tr. 95), and Titus, who had difficulty reading and writing (Tr. 98), testified that he did not remember writing anything on the birth affidavit form except his signature. (Tr. 101). Contrary to the representations in the affidavits, both Titus and Brown met Whab for the first time in the Poughkeepsie area shortly before the false birth affidavits were executed in June 2001. (Tr. 93–94, 100–01). Neither Titus nor Brown had ever been to Brooklyn, and neither Titus nor Brown ever knew any of Whab's family members or had any personal knowledge regarding where Whab was born. (Tr. 96, 100).

b. *Whab's Submission Of A Forged Baptismal Certificate To Supplement His Passport Application*

The clerk who accepted Whab's passport application flagged it as suspicious, and forwarded it to Duncan Maitland, a fraud prevention manager with the Passport Agency. (Tr. 46, 62). After reviewing the materials that Whab submitted to the Dutchess County Clerk's office on June 20, 2001, Maitland determined that there was insufficient proof of Whab's United States

citizenship to warrant the issuance of a passport. (Tr. 63). Accordingly, on July 2, 2001, Maitland sent Whab a letter advising him that the documentation already submitted was insufficient, and seeking more information. (Tr. 66; GX 7). In particular, Maitland requested that Whab submit:

> four personal documents in order to help confirm your identity. The documents must be more than ten years old. The most helpful type of documents are: school transcripts, high school yearbook pages showing your photograph, religious, medical, tax and work records.

(Tr. 66; GX 7). The purpose of the letter was to obtain documents which would establish Whab's identity, where he was born and where he grew up. (Tr. 67).

In response, on approximately July 6, 2001, Whab sent to the Passport Agency a number of documents, including a document purporting to be a "certificate of baptism" from the Immaculate Conception Church in the Bronx, New York. (Tr. 68–70; GX 8A–L). The "certificate of baptism" submitted by Whab was a printed form on the letterhead of the Immaculate Conception Church. (GX 8C). The document stated, in handwriting, that "Usama Sadik Abdel Whab," child of "Kristena N. Istevan" and "Sadik Abdel–Whab" and born in "Brooklyn, N.Y." on the "27" day of "May, 1975," was baptized at the Immaculate Conception Church in the Bronx, New York on July 5, 1975. (Tr. 69–72; GX 8C). The certificate was dated June 20, 2001. (GX 8C)

Of all of the documents that Whab sent to the Passport Agency, Maitland was particularly interested in the baptismal certificate, because in the absence of an official birth record, "we have to go to secondary documentation, and one of the best pieces of secondary documentation would be a certificate of baptism, a church record."

(Tr. 69). The value of a baptismal certificate in the passport application process is that it reflects an "old" event (an event that occurred at or near the time of the applicant's birth) and "it has an institution [the church] that backs it up." (*Id.*).

However, Maitland noticed that Whab's baptismal certificate was unusual. First, the document appeared to be a photocopy and not an original church document with a raised seal. (Tr. 70). Second, the document contained no signature from a pastor to certify that the baptism was, in fact, reflected in the permanent baptismal registry of the church. (Tr. 71).

Indeed, the evidence at trial overwhelmingly established that the baptismal certificate that Whab submitted was a forgery. (Tr. 158–65). Father LoSasso of the Immaculate Conception Church testified that "the baptismal register of the church indicates only one baptism that was done on July 5, 1975, and this one [Whab's purported baptism] does not appear at all." (Tr. 162). Father LoSasso stated that he searched the baptismal registry "as far back as I could" and could not find any baptisms with the name Usama Sadik Abdel Whab. (Tr. 164).[3] Although Whab was never baptized at the Immaculate Conception Church, his American-born wife, Maria Petrillo, was baptized there on November 5, 1983. (Tr. 164; GX 23). Moreover, the godparents listed on Whab's forged certificate of baptism were actually, according to the official baptismal registry, his wife's godparents (Tr. 164–65; GX 23, GX 8C), and the priest that performed Maria Petrillo's baptism was the same priest listed on Whab's forged certificate. (*Id.*).

After reviewing all of the materials that Whab had submitted, Maitland referred Whab's passport application to the Diplomatic Security Service, the law enforcement arm of the State Department, for criminal investigation. (Tr. 74).

### c. *Whab's Prior Statements That He Was Born In Egypt*

In July 1998, while living in Egypt, Whab applied for admission to Saginaw Valley State University in Saginaw, Michigan ("SVSU"), a American university which has an English-language program for foreign students. (Tr. 146–58; GX 17). In Whab's July 25, 1998 application for admission to SVSU, he stated that he was born in "Shiben El Kom, Egypt" on May 27, 1975. (Tr. 150; GX 17). Whab signed the application under the certification: "I certify that the information given in this application and the accompanying documents are complete and accurate." (GX 17). Whab was accepted at SVSU, and the school sent him a completed State Department form I–20 which certified that he was set to attend SVSU. (Tr. 127–28, 148–49; GX 20). A form I–20 completed by an American institution is required before a non-United States citizen may apply for a visa to enter the United States as a student. (*Id.*).

On September 23, 1998, approximately three years before applying for his United States passport, while living in Egypt, Whab submitted an application for a non-immigrant student visa to the American embassy in Cairo, Egypt ("the 1998 Visa Application"). (Tr. 135–37; GX 12).[4] In the 1998 Visa Application, Whab again

---

**3.** Father LoSasso added that the church would never release an unsigned certificate of baptism such as the one submitted by Whab to the Passport Agency. He also noted that Whab's certificate was missing the raised seal of the church. (Tr. 163).

**4.** A non-immigrant student visa allows a non-citizen of the United States to enter the United States temporarily to study at a particular institution. (Tr. 126–31).

stated that he was born in "Shibin El Kom, Egypt" on May 27, 1975, and that he wished to enter the United States to study at SVSU. (*Id.*). In answer to the question, "How long do you plan to stay in the USA?" Whab answered "length of study." In answer to the question, "Have you ever been in the USA?" Whab checked the box responding "no." (*Id.*) Whab signed the 1998 Visa Application under the certification, "I certify that I have read and understood all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my belief." (GX 12). Whab submitted the form, and a student visa was issued that same day. (Tr. 135).

Whab did not travel to the United States before the expiration of his 1998 student visa. On October 23, 1999, Whab completed a second application for a non-immigrant student visa ("the 1999 Visa Application") at the American embassy in Cairo. (Tr. 137–41; GX 15). Again, Whab stated that he was born in Egypt, this time indicating that he was born in "Cairo, Egypt" on May 27, 1975. (GX 15). Again, Whab stated that he wished to enter the United States to study at SVSU. (*Id.*) Whab signed the 1999 Visa Application under the certification, "I certify that I have read and understood all the questions set forth in this application and the answers I have furnished on this form are true and correct to the best of my knowledge and belief." (GX 15). Whab received a second student visa on October 26, 1999. (GX 15, GX 16).

In January 2000, based on Whab's representations (via e-mail) that he would soon arrive at the school, SVSU pre-registered Whab for classes. (Tr. 155–57). In January 2000, Whab used his Egyptian passport and his non-immigrant student visa to travel from Egypt to New York, New York, where he was permitted to enter the United States for the sole purpose of studying at SVSU. (Tr. 132, 140–42; GX 16). Whab, however, never appeared at SVSU after entering the United States and never contacted the school again. (Tr. 157). Instead, after entering the United States, Whab settled in the Hudson Valley area in New York, where he remained until his arrest on these charges. (Tr. 195). Because Whab violated the terms of his student visa by entering the United States and failing to appear at SVSU, he was "out of status," had no legal right to remain in the country, and could have been deported back to Egypt at any time. (Tr. 131–32).

### d. *Whab's Statements To A Agent Capstraw in October 2001 That He Was Born In Brooklyn*

On October 31, 2001, at approximately 5:00 p.m., Special Agent Jason Capstraw of the Drug Enforcement Administration interviewed Whab at St. Francis Hospital in Poughkeepsie, New York, where Whab was scheduled to have surgery on his wrist the following day. (Tr. 105–08, 111). The interview took place in a room provided by the hospital. (Tr. 112).

To avoid any undue prejudice to Whab, the Government did not elicit from Agent Capstraw the specific reasons that Agent Capstraw sought to interview Whab on October 31, 2001. (Transcript from pretrial hearing on July 11, 2002 ("Hearing Tr.") 42–45). Accordingly, the jury was not advised that Agent Capstraw sought to interview Whab in connection with the investigation conducted by numerous federal law enforcement agencies, including the Drug Enforcement Administration, following the terrorist attacks of September 11, 2001. (Hearing Tr. 42–43). Nor was the jury advised of the background of the interview: that Agent Capstraw was investigating storage facilities in New York State after the September 11 attacks to deter-

mine whether those facilities contained any contraband or hazardous materials, and that this investigation led Agent Capstraw to seek to interview Whab about, among other things, his identity and his country of origin. (*Id.*). At trial, the Government simply asked Agent Capstraw whether his interview with Whab was a matter within the jurisdiction of the Executive Branch of the United States Government, and whether Whab's name and place of birth were relevant to Agent Capstraw's investigation. (Tr. 111–13). Whab did not object to this approach at trial or on appeal, conceding that the interview was a matter within the jurisdiction of the government of the United States.

Agent Capstraw testified that he identified himself as an agent with the Drug Enforcement Administration, and told Whab that he was conducting an official investigation and wished to ask Whab some questions. Agent Capstraw specifically advised Whab that Whab was *not* required to speak with him, and Whab agreed to answer some questions. (Tr. 112). In response to Agent Capstraw's inquiries, Whab stated that he was born in Brooklyn, New York. (Tr. 113). When Agent Capstraw inquired why Whab was traveling on an Egyptian passport, Whab claimed that he had lost his birth certificate, and that he had spent a "large amount of money" trying to obtain his birth certificate, but "the City of New York had lost it also." (Tr. 113).

Whab told Agent Capstraw that he left Brooklyn when he was approximately 11 years of age to return to Egypt, and that prior to his return to Egypt, he had attended elementary school in Brooklyn but could not remember the name of the school. (Tr. 114). Upon hearing that Whab had spent his early childhood in New York, Agent Capstraw asked Whab a number of "general cultural questions"

such as "what kind of grades did you get in recess?" and "what are monkey bars?" (Tr. 115.). Whab told Agent Capstraw that he got "very good grades" in recess and Whab "simply avoided the question" about monkey bars. (*Id.*).

In describing Whab's demeanor during the interview, Agent Capstraw noted that when Whab liked a question, "he would turn to me, look me straight in the eye, he would open his hands, he would open his body stance, like he liked speaking to me at that point" but that when Whab did not like the question, "he was very guarded, very pulled back. He closed his arms. He crossed his legs. He turned away from me and talked away from me." (Tr. 115–16).

Agent Capstraw was cross-examined extensively by plaintiff's defense counsel with regard to plaintiff's condition during the interview. (Tr. 117). Indeed, at the outset of the trial, plaintiff's counsel had specifically raised questions regarding plaintiff's competency during the interview and the voluntariness of his statements to Agent Capstraw. At defense counsel's request, the Court conducted a hearing prior to permitting Agent Capstraw to testify before the jury, to explore the circumstances surrounding the interview. Agent Capstraw told the Court that he spoke with the a hospital administrator to obtain permission to interview plaintiff. (Tr. 105–106). Agent Capstraw also told the Court that plaintiff appeared to have an IV attached to his arm, but that hospital staff had determined prior to the interview that plaintiff was not sedated at the time. (*Id.* at 106). After hearing from Agent Capstraw the Court stated:

> I could not even begin to conclude that the defendant wasn't competent to talk to the agent, such as to bar his testimony. It appears from credible testimony, given by the agent to me, at least in this

preliminary matter, that the defendant brought himself into a room in the hospital ... The fact that defendant was ambulatory and appeared coherent to the agent is sufficient for me to allow the jurors to hear his testimony.

*Id.* at 108.

Agent Capstraw restated on cross examination—in the presence of the jury—that he knew that plaintiff was awaiting surgery and that he saw an IV attached to plaintiff's arm, but did not know what was being administered through the IV. (*Id.* 117–118).

Plaintiff confirmed during his testimony that Agent Capstraw interviewed him on October 31, 2001. He testified that on that date, he had been given an antibiotic and a pain killer, but could not remember if he had difficulty understanding Agent Capstraw's questions. (*Id.* 221). He denied having told Agent that he lived in the United States as a child and also asserted that Agent Capsraw was a "liar." (*Id.* 220).

e. *Whab's Statement, In His January 2002 Application For A Marriage License, That He Was Born In Egypt*

On January 7, 2002, after Whab had failed to procure a United States passport, he applied for a license to marry a United States citizen, in the office of the Town Clerk for Wappinger Falls, New York. (Tr. 170–72; GX 25). Whab told the deputy clerk, who filled out the marriage license, that he was born in Egypt on May 27, 1975, and that both of his parents had also been born in Egypt. (Tr. 170–72; GX 25). This information, provided by Whab, was reflected in the marriage license; Whab signed the license under the certification, "I, being duly sworn, depose and say, that to the best of my knowledge and belief

that the information I provided is true." (GX 25).

2. *The Defense Case*

Whab testified on his own behalf. Whab admitted that he had an Egyptian birth certificate, indicating that he was born in Egypt. (Tr. 181). Whab testified, however, that his Egyptian birth certificate was a fake, and that "[a]nyone [in Egypt] can walk in to get birth certificate. It cost two dollars ... You just say, 'I have five kids at home,' and they will give you a birth certificate." (Tr. 181–82).

Whab testified that he grew up in Cairo, living with his mother, Atiat Shaban, and a man who he "understood to be" his father. According to Whab, when he filled out the application to SVSU and the 1998 Visa Application, he believed that he had been born in Egypt. (Tr. 181–83). After Whab received his first student visa in 1998, his mother told him, on her deathbed, that he had been born in Brooklyn, that the Egyptian man who he had believed was his father was actually his stepfather, and that she did not know the identity of his real father. (Tr. 188–90). Whab testified that after his conversation with his mother, he believed that he had been born in Brooklyn. (Tr. 206).

According to Whab, in 1999, he went to the United States embassy in Cairo, Egypt and told "the employees" that "my mother told me I was born [in the United States] in Brooklyn, New York." (Tr. 191). Whab gave his name and date of birth, and was told to "come back next week." (*Id.*). According to Whab, he returned to the embassy the following week and was told that there was no record of his birth. (*Id.*).

To explain his statement in his 1999 Visa Application that he was born in Egypt (after supposedly learning from his mother that he was born in the United States), Whab testified that an employee of the

American embassy advised him to make this false statement. (Tr. 191–92). Specifically, Whab testified that this employee instructed him to "Fill [out] your application for [a] second visa from your [Egyptian] passport" and to "just go, and when you go to the United States, seek your citizenship in the United States." (Tr. 191–92).

Similarly, Whab acknowledged that the birth affidavits he submitted with his passport application were false, but claimed that someone at the Dutchess County Clerk's Office simply told him to procure birth affidavits signed by United States citizens. (Tr. 202–03). Whab testified that, based on that individual's advice, he found two United States citizens to sign false birth affidavits stating that they had knowledge that he was born in Brooklyn. (Tr. 203–05).

Whab also admitted that he submitted a forged baptismal certificate to the Passport Agency in July 2001, using his wife's baptismal certificate as a template. (Tr. 213–14, 235–36). Whab insisted, however, that the false baptismal certificate was not intended to deceive, and that he never thought that anyone would believe that the baptismal certificate was genuine. (Tr. 213–14). Instead, Whab claimed that he sent the false baptismal certificate to the Passport Agency because he was homeless, and he hoped that by sending this false document to a government agency he might be placed in jail and avoid being homeless and starving during the winter. (Tr. 214). Whab added that he also hoped that sending this fake document would trigger a governmental investigation which would produce records proving that he was born in the United States. (*Id.*).

Whab repeatedly explained his various false and conflicting statements regarding his place of birth by claiming that at the time the statements were made, he was homeless, starving, or not in his mind. (Tr. 204 ("I was homeless and starving at this time, and I can't focus on anything"), 208 ("I am not going to be homeless and starving in the wintertime. That was in my mind."), 214 ("I was homeless ... They will save me from the winter, to be starved or homeless in the wintertime."), 217 ("my mind is focused about this issue and like, I spent long time, in my mind, starving, homeless") 232 ("In that time, when I submit this application, I wasn't in my mind. I was—I have never been homeless in my life. I became homeless here. I never been in the snow in my life."), 236 ("I was homeless and starving")). In addition, when confronted with his marriage license, executed in January 2002 and reflecting Whab's statements to the clerk that he was born in Egypt, Whab testified, "I said I was born in Egypt to save my mind from keep thinking about where is my birth record or something, where is my father or something. I didn't consider it as a lie." (Tr. 240–41). Whab insisted, however, that despite telling the marriage license clerk in January 2002 that he was born in Egypt, at the time of trial in July 2002, he believed that he was born in Brooklyn. (Tr. 241).

### f. *The Jury's Verdict*

On July 18, 2002, the jury convicted Whab on all three counts of the Indictment.

### g. *Sentencing*

On September 16, 2002, the Court sentenced Whab to a term of 6 months' imprisonment, to be followed by three years' supervised release, and a $300 special assessment.

### h. *Appeal*

Whab appealed his conviction in the Second Circuit, raising three points on appeal:

(1) that the evidence at trial was insufficient to support his conviction on Count Three (making a false statement to a federal agent) because there was no direct proof that Whab knew that lying to a federal agent is a crime; (2) that the evidence at trial was insufficient to support his conviction on Count Two (use of a false writing in a matter within the jurisdiction of the United States), because the Government failed to establish that his false birth certificate was material; and (3) that the Court committed reversible error by refusing to instruct the jury that, in connection with Count One (passport fraud), the jury was not to consider the reasonableness of Whab's beliefs about where he was born.

The Court of Appeals rejected all three of Whab's points on appeal in a published opinion. *United States v. Whab,* 355 F.3d 155 (2d Cir.2004). With respect to Whab's first point, the Second Circuit found "no basis for [Whab's] claim that . . . 18 U.S.C. § 1001 requires a defendant's specific knowledge that his conduct is criminal." *Id.* at 161. With respect to Whab's second point, the Second Circuit held that "the Passport Agency was . . . entitled to consider [the forged baptismal certificate] as evidence of defendant's place of birth, and he cannot claim that his forgery was immaterial as a matter of law." *Id.* at 163. With respect to Whab's third point, the Second Circuit held that the Court's instruction to the jury regarding the passport fraud statute as applied to this case:

> that the Government must prove beyond a reasonable doubt that the defendant knew he was not born in Brooklyn—properly stood on its own, avoiding the risk of confusion inherent in bringing the concept of 'reasonableness' to the jury's attention, and then asking the jury to disregard it.

*Id.* at 164.

On April 19, 2004, the United States Supreme Court denied Whab's petition for a writ of certiorari. *Whab v. United States,* 541 U.S. 1004, 124 S.Ct. 2055, 158 L.Ed.2d 519 (2004).

### i. Motion for a New Trial

On March 15, 2005, plaintiff filed a motion for a new trial alleging *inter alia* that Agent Capstraw "lied under oath" when he testified that he interviewed plaintiff before he was sedated. Plaintiff also alleged that he was under the influence of strong pain killers during the interview. He further asserted that Agent Capstraw's investigation and testimony were false and pursued "to satisfy his own personal racial hate toward [plaintiff]." (*See* Declaration of Defense Counsel, Exh. E). Attached as an exhibit to plaintiff's motion for a new trial is a DEA report, prepared by Agent Capstraw, regarding the agent's investigation of plaintiff during late 2001. The reports set forth the basis for the agent's investigation and interview of plaintiff, including that plaintiff entered the United States on a student visa to attend college in Michigan, but had never actually reported to begin his studies, and that plaintiff had sought a drivers license with a hazardous material license. The report also details the circumstances surrounding the agent's interview of plaintiff. Plaintiff also attached as an exhibit to the same motion an FBI report dated October 10, 2001, that states *inter alia* that plaintiff told investigators that he went to "Richmor Aviation at the Dutchess County Airport in Wappingers Falls, New York to inquire about pilot training." *Id.* The Court denied plaintiff's motion on March 28, 2005.

### j. Civil Actions

Plaintiff next filed a series of habeas petitions based on grounds similar to those propounded in his new trial motion. Those petitions were all dismissed by this

Court and those dismissals were, ultimately, upheld on appeal.

That leads us to the instant consolidated civil matters involving Agent Capstraw.

## II. Allegations in Amended Complaint

In the Amended Complaint of dockets 05 CV 2896 and 05 CV 4929, plaintiff alleges that Agent Capstraw began investigating him shortly after September 11, 2001, because plaintiff "fits terrorist categories." Amend Complaint ¶ 14. Attached to the amended complaint is a copy of handwritten investigation notes by Agent Capstraw, detailing his investigation of plaintiff. *See id.* at Exh. 1. The report states that Agent Capstraw, conducting investigatory interviews at storage moving companies, was informed by owners of Finnegan's Moving warehouse Corporation, located in Newburgh, New York, of "suspicious activity" by plaintiff, who had arrived at the company in search of a commercial driver's license with hazardous materials endorsements. *Id.* at 2. A check of immigration records related to plaintiff revealed that he entered the United States on a student visa, which Agent Capstraw believed to have expired in 2000. *Id.* Additional background checks revealed that plaintiff had received a commercial driver's license with hazardous material endorsements. *Id.*

Plaintiff claims that during the investigation, Agent Capstraw gave "his superiors false information about plaintiff" because plaintiff never received a commercial driver's license with a hazardous material endorsement; rather he had only had a commercial learner's permit, and had a student visa that expired on October 2004, not in 2000, as Agent Capstraw reported. Amended Complaint ¶ 18.

With regard to the October 31, 2001 interview, plaintiff asserts that Agent Capstraw "took advantage of [him] while he wasn't in his mind and under the influence of medication and other pain killers." Amended Complaint ¶¶ 16–17. Plaintiff further alleges that during the interview, two hospital security guards stood outside of the door to the office and that Agent Capstraw never advised him of his Miranda rights. Amended Complaint ¶¶ 17, 21.

Plaintiff alleges six separate causes of action against Agent Capstraw. He asserts a common law tort claim under New York Law for intentional infliction of emotional distress, and five Bivens claims alleging violations of the First, Fourth, Fifth and Fourteenth Amendments.

## III. Plaintiff's Common Law Tort Claim (Sixth Cause of Action) is Dismissed for Lack of Jurisdiction

Plaintiff's Sixth Cause of Action alleges that Agent Capstraw intentionally inflicted emotional injuries upon plaintiff.

■ An action against a federal agency or federal officers in their official capacities is barred unless sovereign immunity has been waived. *Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 510 (2d Cir.1994)(citing cases). Although the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, waives sovereign immunity for certain tort claims brought directly against the United States, the statute explicitly excludes any tort action against individual federal employees where they were acting within the scope of their employment at the time of the alleged tort. *See* 28 U.S.C. § 2679(b)(1) ("any other civil action or proceeding for money damages arising out of or relating to the same subject matter against the employee or the employee's estate is precluded."); *Rivera v. United States,* 928 F.2d 592, 608 (2d Cir.1991) (federal employees acting within

the scope of their employment enjoy "immunity against claims of common law tort").

▮ In this case, the United States Attorney for the Southern District of New York has certified that Agent Capstraw was acting within the scope of his employment with the DEA with respect to the events from which plaintiff's common law tort claim arose. *See* Declaration of David N. Kelly, United States Attorney, dated June 15, 2005 ("Kelly Declaration"). Plaintiff's claim of emotional injuries is thus a claim against the United States. *See* 28 U.S.C. § 2679(d).

However, tort claims against the United States are barred unless the claimant files an administrative tort claim with the appropriate federal agency within two years after such claim accrues. *See* 28 U.S.C. § 2401(b). A court lacks subject matter jurisdiction over a plaintiff's tort claim unless the plaintiff has properly exhausted his or her administrative remedies *See McNeil v. United States,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("the FTCA bars claimants from bringing suit in federal court until they have exhausted their administrative remedies."); *Johnson v. Smithsonian Institution,* 189 F.3d 180, 189 (2d Cir.1999) ("In order to state a claim under the FTCA, the person attempting to assert it must comply with several strictly construed prerequisites. Unless a plaintiff complies with these requirements, a district court lacks subject matter jurisdiction over a plaintiff's FTCA claim."); *In re "Agent Orange" Product Liability Litigation,* 818 F.2d 210, 214 (2d Cir.1987) (limitations period set forth in Section 2401(b) is jurisdictional in nature).

Plaintiff did not file an administrative tort claim regarding his claim for emotional injuries prior to commencing the current action. *See* Declaration of Bettie E. Goldman, dated May 18, 2005, at ¶ 6. Ac-cordingly, plaintiff's Sixth Cause of Action is dismissed for lack of subject matter jurisdiction. *See Robinson,* 21 F.3d at 510; *Porter v. Hirsch,* 345 F. Supp.2d 400, 403 (S.D.N.Y.2004); *Hightower v. United States,* 205 F.Supp.2d 146, 153–54 (S.D.N.Y.2002). Moreover, as the events alleged in the amended complaint occurred in 2001, any administrative claim filed now would be time-barred, so the claim is dismissed with prejudice.

## IV. Plaintiff's *Bivens* Claims are Dismissed for Failure to State a Claim

In considering a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true the factual allegations set forth in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994). The court may not dismiss a complaint unless it appears "that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997) (internal quotation omitted). "The issue is not whether plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York v. Ass'n of the Bar of the City of New York,* 286 F.3d 122, 125 (2d Cir.2002) (citing *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)).

### A. Plaintiff's *Bivens* Claims are Time Barred

Plaintiff's five remaining claims, which assert a battery of constitutional torts against Agent Capstraw, are barred by the three-year statute of limitations for *Bivens* claims. *See Tapia-Ortiz v. Doe,* 171 F.3d 150, 151 (2d Cir.1999) (citing *Owens v. Okure,* 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989)); *Kronisch v.*

*United States,* 150 F.3d 112, 123 (2d Cir. 1998); *Chin v. Bowen,* 833 F.2d 21, 22–23 (2d Cir.1987). This limitations period begins to run from the date a plaintiff knows or has reason to know of the injury that is the basis of his claim. *See Hayes v. Federal Bureau of Investigation,* 562 F.Supp. 319, 323 n. 4 (S.D.N.Y.1983) (citing *Barrett v. United States,* 689 F.2d 324, 333 (2d Cir.1982)); *see also Leon v. Murphy,* 988 F.2d 303, 308 (2d Cir.1993) (in the context of claims brought under 42 U.S.C. § 1983, limitations period begins to run when plaintiff knows or has reason to know of his injury).

The two consolidated actions naming Agent Capstraw were filed on March 16, 2005 and May 24, 2005. However, the claims in those actions arise from events that occurred in October and November 2001–more than three years prior to the commencement of these proceedings. Plaintiff does not raise the issue of equitable tolling and the Court sees no basis to toll the three year statute of limitations in this case. Accordingly, plaintiff's First, Second, Third, Fourth and Fifth cause of actions are time barred.

### B. Plaintiff's *Bivens* Claims are Barred by *Heck v. Humphrey*

■ Even if plaintiff's *Bivens* claims were timely filed, those claims are barred by the Supreme Court's decision in *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994).

In *Heck,* the Supreme Court held that civil claims arising from a plaintiff's criminal conviction are barred unless "the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." 512 U.S. at 487, 114 S.Ct. 2364. Although it is

well established that a civil action for damages may be asserted against federal officials who violate certain clearly established constitutional rights, *see Bivens,* 403 U.S. at 397, 91 S.Ct. 1999, the Heck Court recognized that requiring a plaintiff to demonstrate that the criminal proceeding terminated in his favor "precludes the possibility of the claimant succeeding in the tort action after having been convicted . . . in contravention of a strong judicial policy against the creation of two conflicting resolutions arising out of the same or identical transaction." 512 U.S. at 484, 114 S.Ct. 2364.

The plaintiff in *Heck,* who had been convicted of voluntary manslaughter in state court, brought an action pursuant to 42 U.S.C. § 1983, alleging that the Indiana State Police had engaged in an unlawful investigation leading to his arrest, had destroyed exculpatory evidence, and had used an illegal voice identification procedure at trial. *Id.* at 479, 114 S.Ct. 2364. Acknowledging "the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments," *Id.* at 486, 114 S.Ct. 2364, the Supreme Court held that in order to proceed with his action, the plaintiff would either have to show that his conviction had been invalidated, or show that his claims, if successful, would not demonstrate the invalidity of the outstanding criminal judgment, *id.* at 487, 114 S.Ct. 2364. Although, *Heck* involved a section 1983 claim, the Second Circuit has held that the rationale of *Heck* applies equally to *Bivens* actions such as plaintiff's. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir.1995); *see also Maietta v. Artuz,* 84 F.3d 100, 103 n. 1 (2d Cir.1996).

Plaintiff's *Bivens* claims against agent Capstraw are barred under *Heck.* Plaintiff's 2002 conviction for making false statements has not been reversed. The

conviction was upheld by the Second Circuit, *see United States v. Whab*, 355 F.3d at 164, and his petition for certiorari was denied, *see Whab v. United States*, 541 U.S. 1004, 124 S.Ct. 2055, 158 L.Ed.2d 519 (2004). A valid conviction precludes a *Bivens* action based on the same facts. *See Channer v. Mitchell*, 43 F.3d 786, 788 (2d Cir.1994) (affirming dismissal of Section 1983 claims under Heck where plaintiff failed to establish that his conviction had been reversed); *Cameron v. Fogarty*, 806 F.2d 380, 386–89 (2d Cir.1986) (dismissing section 1983 action for unlawful arrest because conviction gave officers an absolute defense); *Duamutef v. Morris*, 956 F.Supp. 1112, 1115–1118 (S.D.N.Y.1997) (dismissing 1983 claims under Heck where plaintiff's conviction was valid).

Moreover, plaintiff's claims against Agent Capstraw are barred because if he were to prevail in this action, a judgment in his favor would necessarily imply that his conviction for making false statements during the October 31, 2001 interview was invalid. *Heck*, 512 U.S. at 487, 114 S.Ct. 2364; *Amaker v. Weiner*, 179 F.3d 48, 51 (2d Cir.1999).

### C. Plaintiff's *Bivens* Claims are Barred by Collateral Estoppel

In addition to being barred under *Heck*, plaintiff's *Bivens* claims are also barred by the doctrine of collateral estoppel.

Collateral estoppel bars relitigation of an issue that was "actually and necessarily determined by a court of competent jurisdiction ... in subsequent suits based on a different cause of action involving a party to the prior litigation." *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); *Allen v. McCurry*, 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). It is well settled that a criminal conviction, whether by jury verdict or guilty plea, constitutes estoppel in favor of the United States in a subsequent civil proceeding as to those matters determined by the judgment in the criminal case. *United States v. Podell*, 572 F.2d 31, 35 (2d Cir.1978).

Here, plaintiff has not presented any claim that was not previously presented to this Court and jury in *United States v. Whab*. All of the claims in the present action were previously litigated during the criminal litigation and resolved in favor of the United States. In plaintiff's Second and Third cause of action, plaintiff raises the issue of the voluntariness of his statements to Agent Capstraw. Plaintiff had "a full and fair opportunity" to challenge the voluntariness of his statements prior to, during, and after trial. Those challenges were thoroughly litigated and resolved against plaintiff during the various stages of the criminal case. Therefore, plaintiff's Second and Third claims are barred by collateral estoppel.

Plaintiff's remaining claims alleging racial profiling during Agent Capstraw's investigation and interview of plaintiff are also barred under the collateral estoppel doctrine. Following his conviction in *United States v. Whab*, plaintiff filed a "Notice of Motion for a New Trial Based on Newly Discovered Evidence and for Good Cause Shown," which put the very same racial profiling claims before the Court. This Court denied that motion, finding no merit in Whab's "new evidence" of racial profiling. Plaintiff is, thus, collaterally estopped from bring the same claims in the present case.

### V. Agent Capstraw is entitled to Qualified Immunity

Even if this Court were to find that plaintiff's *Biven's* claims are not barred on other grounds, Agent Capstraw is shielded from suit by qualified immunity.

■ The doctrine of qualified immunity provides "that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established ... constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. at 818, 102 S.Ct. 2727; *see also Martinez v. Simonetti,* 202 F.3d 625, 633–34 (2d Cir.2000). This rule "recognizes that officials can act without fear of harassing litigation only if they can reasonably anticipate when their conduct may give rise to liability for damages and only if unjustified lawsuits are quickly terminated." *Davis v. Scherer,* 468 U.S. 183, 195, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984). Accordingly, to ensure that government officials do "not err always on the side of caution" because they fear being sued, the "qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant,* 502 U.S. 224, 229, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

The Supreme Court has emphasized that qualified immunity is "an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (emphasis in original). Thus, a qualified immunity ruling "should be made early in the proceeding so that the costs and expenses of trials are avoided where the defense is dispositive." *Saucier v. Katz,* 533 U.S. 194, 200, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *see also Cartier v. Lussier,* 955 F.2d 841, 844 (2d Cir.1992) ("[T]he Supreme Court has expressly encouraged the use of summary judgment when qualified immunity is raised as a defense.").

■ Generally, courts must perform a two-step analysis in determining whether an official is entitled to qualified immunity. *See Loria v. Gorman,* 306 F.3d 1271, 1281 (2d Cir.2002). Before proceeding to the analysis, however, "[t]he threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer,* 536 U.S. 730, 122 S.Ct. 2508, 2513, 153 L.Ed.2d 666 (2002); *Wilson v. Layne,* 526 U.S. 603, 609, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999). If a plaintiff's allegations do not state a constitutional claim, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151.

On the other hand, if plaintiff adequately alleges a constitutional violation, a court must then determine whether the constitutional right at issue was clearly established at the time of the alleged infringement. *See Saucier,* 533 U.S. at 201, 121 S.Ct. 2151; *Wilson,* 526 U.S. at 609, 119 S.Ct. 1692. If it was not clearly established, then the court must "analyze the objective reasonableness of [a defendant official's] belief in the lawfulness of his actions." *Loria,* 306 F.3d at 1282. If the official "reasonably believed that his actions did not violate plaintiff's rights, [the official] is entitled to qualified immunity even if that belief was mistaken." *Id.*

■ Assuming plaintiff had successfully alleged a violation of a clearly established constitutional right in his amended complaint, Agent Capstraw would still be entitled to qualified immunity because his actions were "objectively reasonable" when viewed from the perspective of his belief regarding the lawfulness of his actions. *Loria,* 306 F.3d at 1282.

In support of his Bivens claims, plaintiff essentially alleges that Agent Capstraw's investigation and interview of plaintiff were unlawful because he was sedated at the time of the interview, he was not given

Miranda warnings, and Agent Capstraw had obtained information about him regarding his medical records, driver's license, and immigration status. Amend. Compl. ¶ 14–19. With regard to the lawfulness of the interview, Agent Capstraw had been told by hospital officials, and thus believed, that plaintiff was not sedated and could consent to speak with him. *See* July 17, 2002, Whab Tr. at 105–06. Plaintiff thereafter consented to speak with Agent Capstraw, and plaintiff appeared coherent throughout their conversation. *Id.* at 112–13. Based on these circumstances, Agent Capstraw had a reasonable basis to believe that the interview was a consensual conversation, that Miranda warnings were not necessary, *see Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), and that questioning plaintiff was not an arrest in violation of the Fourth Amendment. *See Neighbour v. Covert,* 68 F.3d 1508, 1510 (2d Cir.1995) (to state a claim for a Fourth Amendment violation, a plaintiff must allege that under the circumstances surrounding an incident, "a reasonable person would have believed he was not free to leave"); *see also United States v. Lee,* 916 F.2d 814, 819 (2d Cir.1990).

Furthermore, Agent Capstraw's conduct with regard to this investigation and the information he conveyed to the DEA was also objectively reasonable. Plaintiff has not alleged that Agent Capstraw procured any information by unlawful means. Indeed, even the written reports of Agent Capstraw, which plaintiff introduces as exhibits to his amended complaint make clear that except for an administrative subpoena issued to Saginaw State University, information regarding plaintiff was given voluntarily by third parties to Agent Capstraw.

For instance, Agent Capstraw was informed by the owners of Finnegan's Moving and Warehouse Corporation that plaintiff had engaged in "suspicious behavior." Amend. Compl., Appendix 1, at 1. As a follow-up to the information provided by the owners of Finnegan's, Agent Capstraw obtained further information regarding plaintiff's entry into the United States and immigration status. *Id.* at 2. Once informed that plaintiff was at Saint Francis Hospital, Agent Capstraw spoke to hospital officials to obtain consent to speak to plaintiff and was told that plaintiff had been admitted for surgery on his wrist. *Id.* Following the interview of plaintiff on October 31, 2001, Agent Capstraw contacted Saginaw State University, the college that plaintiff had applied to attend, to confirm information given by plaintiff during the interview, and served a subpoena on the college to obtain further information. *Id.* at 3–4.

Agent Capstraw's investigation of plaintiff was objectively reasonable, based on facts provided by third-parties regarding plaintiff's conduct. *See e.g., SEC v. O'Brien,* 467 U.S. 735, 742, 104 S.Ct. 2720, 81 L.Ed.2d 615 (1984) ("It is established that, when a person communicated information to a third party even on the understanding that the communication is confidential, he cannot object if the third party conveys that information or records to law enforcement authorities."); *United States v. Daccarett,* 6 F.3d 37, 50 (2d Cir.1993) (no Fourth Amendment violation where DEA demanded information regarding electronic fund transfers from intermediary banks and materials requested were relevant to their investigation); *United States v. Manufacturers Hanover Trust Co.,* 485 F.Supp. 653, 655 (S.D.N.Y.1979) (noting the "general rule that the issuance of a subpoena to a third party does not violate the rights of a defendant, even if a criminal prosecution is contemplated at the

time the subpoena is issued."). Despite his allegation of "racial profiling," Amend. Compl. ¶ 20, plaintiff's Amended Complaint and the attached exhibits fail to raise any suggestion that Agent Capstraw's actions were racially motivated or otherwise improper.

Moreover, even if Agent Capstraw had made factual errors (e.g., plaintiff's allegation that he "only has an expired commercial learner permit," rather than an unrestricted license with a hazardous material endorsement, *see* Amend. Compl. ¶ 18), such mistakes would not vitiate the protection of qualified immunity. Agent Capstraw's conduct is to be assessed in light of "the information he possessed" at the time of his actions, *see Wilson,* 526 U.S. at 615, 119 S.Ct. 1692, and the standard of qualified immunity "gives ample room for mistaken judgments, protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter,* 502 U.S. at 229, 112 S.Ct. 534.

Plaintiff has alleged no facts indicating that Agent Capstraw knew or should have known that he was violating plaintiff's constitutional rights. Agent Capstraw's conduct was objectively reasonable and he is entitled to summary judgment on the basis of qualified immunity.

## VI. Conclusion

Defendant Agent Capstraw's motions to dismiss the Amended Complaint for lack of subject matter jurisdiction and for failure to state a claim pursuant to Rules 12(b)(1), 12(b)(5), and 12(b)(6), and for summary judgment pursuant to Rule 56, are granted. Since Agent Capstraw was the only defendant named in docket 05 CV 2896, the Clerk of the Court is to close that case. The Clerk is further directed to dismiss Agent Capstraw from docket 05 CV 4929, which will remain consolidated with 04 CV 7772.

This constitutes the decision and order of the court.